## Johnson, to use of McCarter, Appellant, v. Nippert (No. 1).

Argued October 2, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*James L. Hogan* and *Richard S. Holt,* with them *C. B. McCarter,* for appellant.

*Joseph Knox Stone,* with him *Harold F. Reed,* for appellee.

OPINION BY MR. JUSTICE FRAZER, November 26, 1928:
A contract for the sale of farm land was executed September 12, 1923, between A. L. Johnson, a real estate

broker, acting as sales agent for William Lowry, owner of the property, and Ralph E. Nippert. On a warrant of attorney contained in the agreement, Johnson, claiming a sale of the land had been made to Nippert in accordance with the terms of the contract, entered judgment on October 5, 1923, against him for $18,375. A petition by Nippert to open the judgment was discharged, but later that order of the court was revoked, a reargument heard and the judgment opened generally, which action was affirmed by this court in Johnson v. Nippert, 286 Pa. 175. With the judgment thus opened, an issue was framed by order of the court below and an affidavit of defense filed. Plaintiffs moved for judgment alleging insufficiency of defense, which motion after hearing was discharged, and the case proceeded to trial. The jury returned a general and a special verdict in favor of defendant, plaintiffs moved for a new trial and judgment n. o. v., which motions were denied and this appeal followed.

The record discloses these material facts: The real estate involved comprised a farm of about 100 acres owned by William Lowry, an aged invalid, who with his wife resided upon the land at the time of the execution of the contract between Johnson and Nippert. Johnson, learning from C. B. McCarter, appellant here, that the farm was for sale, visited the Lowry home with McCarter and was informed by Mr. and Mrs. Lowry they would sell the property for $12,000. Either at that meeting or at a subsequent one, Lowry, in general terms, constituted Johnson his agent to find a purchaser for the fixed price of $12,000, of which $6,000 was to be paid in cash and the balance secured by purchase money bond and mortgage. Subsequently Lowry agreed with Johnson and McCarter to take $11,700 cash, the difference, $300 to go to Johnson as a commission. These transactions were carried on previous to the agreement signed by Nippert and were wholly unknown to him.

Having made his arrangements with Lowry, Johnson informed Nippert that the price asked for the premises was $18,000. Nippert urged him to endeavor to secure the property for a less amount. Later Johnson advised him he had secured a price of $17,500, which was the least Lowry would accept. The agreement of sale was then executed between them, wherein Johnson was designated as agent for William Lowry, the consideration was stated as $17,500, of which $1,000 was to be deposited by Nippert in a bank in Beaver Falls, and upon payment of the balance he was to receive the deed. A power of attorney to confess judgment for default in payment within thirty days was incorporated in the instrument. On the day following the signing of the agreement Johnson informed the Lowrys he had secured a purchaser who would pay $11,700 in cash, and arranged with them for a deed, which was immediately prepared by McCarter, who was Johnson's legal adviser and active participant in all negotiations. The consideration named in the deed was one dollar and other valuable considerations. In pursuance of a requirement by Lowry, the deed was submitted to Lowry's attorney for his approval; it was approved by him, he being ignorant, as was Lowry, of the price Nippert had contracted to pay, and on September 13, 1923, the Lowrys executed the deed and mailed it to their attorney, who, in accordance with directions given him by Johnson and McCarter, deposited it with the bank which held the $1,000 hand money, with instructions to the bank to deliver it to Nippert upon payment of $11,700. McCarter, learning these instructions had been given, induced Lowry's attorney to return to the bank and say the deed was not to be given to Nippert, but to Johnson and McCarter. The attorney learned then for the first time of the price Nippert had agreed to pay, took out the deed himself and held up further proceedings. In the meantime the bank had informed Nippert that they were instructed to deliver the deed to him upon a cash payment of $11,700.

Thus Nippert learned for the first time that the selling price of the farm was not $17,500 but $11,700, and thus the Lowrys learned also for the first time that Johnson was selling their land for a price much in excess of the amount they were asking for it.

A few days later by arrangement of Lowry's attorney, a meeting of parties interested, with their legal representatives, was held. Here the Lowrys, Mrs. Lowry interpreting for her husband who because of paralytic strokes was almost totally deaf and unable to speak plainly, denied in detail that they had heard of the contract between Nippert and Johnson, that they had been told by Johnson or anyone else that Nippert had agreed to buy their property for $17,500, that Johnson had been authorized as their agent to sell the land and keep for himself any amount received from a purchaser in excess of $11,700, and declared that they had executed the deed to Nippert with the understanding between them and Johnson that Nippert was paying the exact sum of $11,700 in cash. At that meeting, Nippert declared Johnson repeatedly told him the farm could not be bought for less than $17,500, and, influenced by such representation, he had signed the contract. He then repudiated the agreement and refused to accept the deed executed to him by the Lowrys. The latter denied the authority of Johnson as their agent, and, as principals, released Johnson from all obligations to them incurred by the contract signed by Johnson as their agent. They then offered to make a deed to Johnson and McCarter, or to either of them, at the price of $11,700, which offer was refused. At the conclusion of this meeting, Johnson entered judgment on the power of attorney contained in the instrument against Nippert and in favor of himself in the sum of $18,575, which judgment is the foundation of the present litigation. Almost a year later Johnson made an assignment of the judgment to McCarter. The Lowrys, some time after the meeting noted above, on the ground that they had entirely severed and ended

all agency relations with Johnson, executed, as a separate and independent transaction, a deed for the land in question to Nippert for the price of $11,700, he having refused to pay more.

When the jurors in this case returned their general verdict they certainly found, from the evidence, three established facts: (1) That the contract between Nippert and Johnson was procured by the latter by fraudulent misrepresentations and concealments; (2) that Johnson throughout the entire negotiations acted as the agent for both the seller and buyer, with their knowledge and consent, and in that dual agency was deceiving both; (3) that by this double dealing he was intending and scheming to secure for himself an illegal secret profit. By two special verdicts in answer to questions submitted to them by the court below the jury found there was an option or agreement between Johnson and McCarter and the Lowrys to purchase the farm for $11,700, and that there was not an agreement of agency authorizing Johnson to sell the farm and retain all in excess of that sum.

It was contended by plaintiffs that Johnson made the sale to Nippert under a special agreement with Lowry, whereby they were to receive the excess over $11,700, that they accepted the sale under that agreement and by so accepting and carrying out the sale they ratified the agreement that Johnson and McCarter were to make the sale and retain for themselves any sum realized above $11,700.

The record in the case is of large proportions, but we have examined it with care, and are convinced from our examination that the evidence sustains the verdict of the jury. The entire negotiation for the sale and purchase of the property constituted a program of fraud, arranged and carried through successfully by Johnson, until his own lack of foresight tripped him up. The question of fraud looms largely throughout the entire proceedings of this case. It was alleged in the affidavit of defense

470

that the actions of Johnson and McCarter were in furtherance of a scheme to swindle and defraud Nippert, the purchaser and Lowry, the seller; plaintiffs, as the evidence shows, were openly accused at the meeting of the parties of fraudulent dealings; it was dealt with in a fair and proper manner by the learned trial judge in his charge to the jury, and the evidence in the case is heavy with the proof of it. In fact it is difficult to see how the jury could have reached a different conclusion from what it did.

It is established by the testimony that when Johnson, announcing himself as the agent of Lowry, induced Nippert to sign the contract by which he agreed to pay $17,500 for the land, Johnson had already entered into an agency agreement with Lowry, in the presence of Mrs. Lowry, to find a purchaser who would buy at the price fixed by the owner, $11,700 cash, without giving them the slightest information as to his contract with Nippert. That Johnson was not buying the property for himself, but was acting only as the sales agent of Lowry, is proven not only by the testimony of the Lowrys, but by the direct declarations of Johnson in his own testimony that he acted only in the capacity of agent for Lowry. With this scheme of double dealing under way, Johnson induced the Lowrys to execute their deed to Nippert for the price of $11,700, and cleverly continued to deceive them for the time being, and deceiving Nippert as well, by setting forth in the deed that the consideration was one dollar and other valuable considerations. Unfortunately for Johnson, the subsequent developments at the Beaver Falls Bank brought to light, both to the Lowrys and Nippert, the deception he was practicing.

Here was a betrayal of trust and confidence, as, by becoming the agent of both Nippert and Lowry, Johnson had established such relation between him and them. Contracts, the objects or tendency of which is to constitute a fraud, or breach of trust or breach of duty, on the

part of one who stands in a fiduciary or confidential relation, are illegal and void, as constituting, or tending to establish, a fraud on third parties; and they are illegal because in effect agreements to wrong or to defraud the persons whose interests the fiduciaries have in charge: 13 C. J. 415. That the intention of Johnson, acting as the agent for both buyer and seller, was to make a secret profit of nearly $6,000 by deceiving his principals is palpably apparent throughout the entire record of this case. It was to be the fruit of his fraudulent scheming. Such profit the law will not allow him to realize, much less to retain, if secured. As said in Mechem on Agency, section 469, quoted in Graham v. Cummings, 208 Pa. 516, 533: "All profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent. If his duty be strictly performed, the resulting profit accrues to the principal as the legitimate consequence of the relation; if profit accrues from his violation of duty, that likewise belongs to the principal, not only because the principal has to assume the responsibility of the transaction, but also the agent cannot be permitted to derive advantage from his own default."

We have in the case before us a situation similar in facts and alike in the scope of illegal transactions to that in Everhart v. Searle, 71 Pa. 256, where the question was whether the same person may act as agent in a private transaction for both parties, without the consent of both, so as to entitle him to compensation from both or either, and in that case we held it to be against the policy of the law that such a principle should hold. In the present case the evil is even more notoriously flagrant. Here there was a clear and unquestionable perpetration of fraud on the part of the agent upon both his principals; for it is certainly probable that by fair dealing Johnson could have concluded the sale at a price

472

less than Nippert had agreed to pay and more than Lowry was originally willing to accept, securing for his services an agent's proper commission. In Rice v. Davis, 136 Pa. 439, 442, we said: "The principle, underlying this case, that an agent for the sale of property cannot at the same time act as agent for the purchase thereof, or interest himself therein, and thus entitle himself to a compensation from both vendor and vendee, is grounded on the infallible declaration that 'no man can serve two masters.'"

The contention advanced by plaintiffs that Johnson had a beneficial interest in the agreement sued upon, which he assigned to McCarter, appellant here, was settled in the negative by the verdict of the jury. If he had such interest, it could originate only by a distinct agreement, established by the evidence as a fact, between Lowry and Johnson that the latter was to sell the farm and keep for himself all he received in excess of $11,700. The question whether there was such agreement was put directly to the jury by the learned court below in its charge, and the jury found such agency did not exist.

We have examined the thirty-six assignments of error, of which we consider only two are of such controlling interest as to require special attention. Assignment 17 charges the court erred in affirming defendant's second point for special instruction to the jury that "unless the jury find by a preponderance of the evidence in the case that the Lowrys agreed with Johnson that he should receive everything above $11,700 in case the farm was sold, your verdict must be for the defendant." The court so instructed the jury. No exception was taken to the affirmance of the point and no objection made at the time to the instruction. These were practically the words of plaintiffs' eleventh point, carrying the alternative conclusion, that if the jury found such a contract between Lowry and Johnson was actually made, then neither Lowry nor Nippert had authority to rescind the

agreement. This point, also affirmed by the court, embodied appellants' theory of the case, and, as the learned trial judge notes, upon that theory the case was tried. The jury found, and the evidence fully sustains their conclusion, that no such agreement was made. Assignment 20 challenges the refusal of the court to charge the jury, as requested by plaintiffs, that there is no evidence that Johnson perpetrated or practiced a fraud on Nippert. On this phase of the case we need add no more to what we have already said than to emphasize the inevitable conclusion that the evidence that fraud was practiced upon Nippert is overwhelming. It is true, he was not injured by the transactions; rather, in fact, was he a gainer. Nevertheless, fraud was the motive and the basis of the contract which he was deceived into signing by Johnson. This aspect of the law as presented in the case before us is well set forth in Everhart v. Searle, supra, which governs the present case, as follows: "There was plausibility and seeming force in the argument that as Flagg, the plaintiff's principal in the sale, was not injured by the arrangement with the defendant, there was nothing wrong in making that arrangement. This is specious, but not sound. The transaction is to be regarded as against the policy of the law, and not binding upon a party who has a right to object to it. It matters not that there was no fraud meditated, and no injury done; the rule is not intended to be remedial of actual wrong, but preventive of the possibility of it."

Judgment affirmed.